1  **WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Diana Decker,<br><br>    Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of Social Security,<br><br>    Defendant. | No. CV 08-1919-PHX-JAT<br><br>**ORDER** |

Plaintiff Diana Decker filed this action under 42 U.S.C. § 405(g) seeking judicial review of Defendant Michael J. Astrue's denial of her request for Disability Insurance Benefits under Title II of the Social Security Act ("Act") (Doc. #1). After considering the record before the Court and the parties' briefing of the issues, the Court affirms Defendant's denial of Decker's request for benefits.

**I.   Background**

    **A.   Procedural Background**

In August 2003, Decker filed an application for a period of disability and Disability Insurance benefits, alleging an onset date of disability of June 2, 2002. (Tr. 94) Decker's alleged disability is based upon chronic fatigue syndrom ("CFS"), lower back pain, and depression. On February 3, 2006, an administrative law judge ("ALJ") issued a Notice of Decision–Unfavorable. (Tr. 47) Decker timely requested review from the Appeals Council

concerning the ALJ's decision to deny benefits. In May 2006, the Appeals Council remanded the matter back to the ALJ for further administrative proceedings. (Tr. 92-93) In November 2006, after two additional hearings, the ALJ issued a Notice of Decision–Unfavorable. (Tr. 12) Decker again requested the Appeals Council to review the ALJ's decision to deny benefits. In August 2008, the Appeals Council denied Decker's request to review the ALJ's decision. (Tr. 8) In October 2008, Decker filed the present action seeking review of the ALJ's decision to deny benefits.

### B. Medical Background

In September 1996, Amy Smith, M.D., began treating Decker for obsessive compulsive disorder ("OCD") and major depression. (Tr. 308) At various times leading up to June 2002, Decker was treated for back pain, right hip pain, depression, OCD, and a history of social phobia. On June 3, 2002, Dr. Smith noted that Decker had not been feeling good due to issues relating to her back, she was having trouble sleeping, and she was tired "mostly because she has a new kitten." (Tr. 186) Dr. Smith also noted that Decker had a job interview the following week, and she had also been doing volunteer work and some writing for a newsletter. (*Id.*) Dr. Smith noted Decker's Global Assessment of Functioning ("GAF") as a 60. On June 25, Decker was examined by Robert H. Page, M.D. Decker complained of a lack of energy and difficulty sleeping. (Tr. 291) Dr. Page diagnosed Decker with fatigue and hypothyroidism, and he instructed Decker to increase her exercise program to help with her back pain. (*Id.*)

In September 2002, Decker again sought treatment from Dr. Smith. Decker stated that she continued to feel tired and was easily "worn out," although Decker stated that she continued to work on the newsletters and seek employment. (Tr. 185) Dr. Smith again noted Decker's GAF score as a 60.

Decker returned to Dr. Smith in February 2003. Dr. Smith noted that it takes Decker time to recover when she "over[did] her activities." (Tr. 184) Decker continued to work on the newsletters and she was still searching for a job. Dr. Smith also noted that Decker was sleeping better and had a good energy level. (*Id.*)

In March 2003, Decker visited Dr. Page. Decker stated that she was continuing to feel very tired. (Tr. 286) Dr. Page diagnosed Decker with cytomegalovirus ("CMV"). In June, Decker was again treated by Dr. Page. Decker stated that she has chronic fatigue and CMV; she was suffering from headaches and abdominal aches; and she was having difficulty sleeping. (Tr. 284) Decker informed Dr. Page that she was "working 40 hours a week as a volunteer until she quit about two or three months ago." (*Id.*) Decker brought with her various articles she found on the Internet concerning CMV, chronic fatigue, and other medical conditions. Dr. Page diagnosed Decker with chronic fatigue and cytomegalovirus.

In July 2003, Decker had a return visit with Dr. Page. Decker complained of fatigue, lack of motivation, headaches, dry mouth, as was "thirsty a lot." (Tr. 276) Dr. Page noted that "[l]ab tests have been ordered. Everything has been fine on her liver function studies. All exams have been normal." (*Id.*) Dr. Page diagnosed Decker with chronic fatigue.

In October 2003, Decker contacted Dr. Smith because she was turned down for a new insurance plan. (Tr. 309) Decker sought a letter from Dr. Smith, wherein she requested that Dr. Smith state that Decker had not suffered from OCD in over ten years. When Dr. Smith refused, stating that it was untrue that Decker had been free from OCD for ten years, Decker began yelling, stating that Dr. Smith "had not helped her at all over the years and that no on in the medical profession has ever helped her." (*Id.*) Dr. Smith thereafter terminated care with Decker.

In December 2003, Decker underwent a psychological evaluation at the request of a state agency. The examination was conducted by Robert Narvaiz, M.D. (Tr. 195) Decker stated that she had been depressed all her life, but there had been "improvement in her depression since the year 2000." (Tr. 196) Decker also stated that she had problems with OCD, as she checks her stove and door knobs with regularity. However, Decker reported that she had decreased OCD problems as a result of her religious practices starting in 2001. Decker further stated that she participates in her religion, is an editor for a magazine, enjoys going to the theater and plays, but that she was much more active in the past. (*Id.*) Dr. Narvaiz noted that Decker is "oriented to person, place, time and situation," and that Decker

could recall four out of four objects immediately, and two out of four at five minutes. (Tr. 197) Although Decker struggled with a letter analogy, she understood other similarities given by Dr. Narvaiz. Decker repeated the number 8319454 correctly and understood various proverbs given by Dr. Narvaiz. (*Id.*) Dr. Narvaiz diagnosed Decker with dysthymia and OCD, "both with good control." (*Id.*) Dr. Narvaiz also stated that "[a]t this time, I feel that she does have the ability to return to work." (*Id.*)

During the months of December 2003 through April 2004, Decker received physical therapy, including therapeutic exercises, massage, and the use of hot/cold packs. (Tr. 328-346) During many of these sessions, Decker reported improved sleeping habits resulting from the physical therapy.

In December 2003, Alan M. Abromovitz, M.D., began treating Decker. In March 2004, Dr. Abromovitz–on a form provided by the Arizona Department of Economic Security–states that Decker can occasionally lift ten pounds, she is able to stand and/or walk at least two hours in an eight-hour workday, and she can sit two hours in an eight-hour workday. (Tr. 215-16) Dr. Abromovitz bases his findings on Decker's feelings of pain, weakness, and fatigue.

In April 2004, at the request of a state agency, Decker was examined by Keith Cunningham, M.D. Dr. Cunningham assessed Decker as having chronic pain syndrome with nonfocal neuromuscular exam, a history of longstanding depression, and osteopenia. (Tr. 236) Dr. Cunningham opined that Decker could occasionally lift fifty pounds and frequently lift twenty-five pounds. (Tr. 228) Dr. Cunningham also noted that he believed Decker could stand and/or walk six hours in an eight-hour workday, and that Decker could sit for six hours in an eight-hour workday. (Tr. 228-29)

In May 2004, a state agency physician, after reviewing Decker's file, completed a form entitled "Physical Residual Functional Capacity Assessment," and reached the same conclusions as Dr. Cunningham concerning Decker's exertion limitations. (Tr. 237) That is, Decker can occasionally lift fifty pounds, frequently lift twenty-five pounds; she can sit, stand, and/or walk for six hours in an eight-day workday. (Tr. 238)

1         In June 2004, Decker visited Dr. Page, complaining of chronic fatigue and headaches,
2 as well as back pain. (Tr. 270) Decker stated that she had picked up some small jobs,
3 primarily reading and editing books, but that she could only work two hours a day. Dr. Page
4 diagnosed Decker with CFS. (Tr. 271)

5         In July 2004, Decker visited Katherine Burleson, M.D. Decker reported increased
6 anxiety and depression, including suicidal inclinations but without a plan. (Tr. 348) In a
7 form entitled "Medical Assessment of Ability to do Work-Related Physical Activities," Dr.
8 Burleson noted that, in an eight-hour workday, Decker could sit, stand, and walk less than
9 one hour; and, Dr. Burleson also noted that Decker could only lift and carry less than ten
10 pounds. (Tr. 259)

11         Also in July, Decker was treated by Stephen E. Fry, M.D. Dr. Fry diagnosed Decker
12 with CFS by history and prescribed her medications. (Tr. 374)

13         In August 2004, Decker visited Gary J. Silverman, D.O. Decker reported that she was
14 suffering from fatigue, headaches, and severe back and hip pain. (Tr. 396) Decker reports
15 doing tai chi weekly and that her visits with Dr. Abromovitz had "helped her greatly with
16 sleep improvement." (Tr. 396, 402) Also in August, Decker was treated by Dr. Fry. Decker
17 reported an increase in insomnia, sore throat, and abdominal pain. Dr. Fry recommended that
18 Decker reduce her medications. (Tr. 372)

19         In September 2004, Decker again visited Dr. Silverman. Decker stated that she was
20 having trouble doing volunteer work and that she was still experiencing back pain. (Tr. 392)
21 Dr. Silverman assessed Decker as having stable CFS. (Tr. 393)

22         In December 2004, Decker underwent a bone density test, with the results showing
23 that Decker has osteopenia with a moderate fracture risk. (Tr. 411)

24         In January 2005, Decker returned to Dr. Fry for a follow up visit. Decker stated that
25 her headaches were "almost resolved" and she was no longer suffering from a sore throat.
26 (Tr. 371) Decker also reported some irritability and fatigue, although she was walking,
27 "which she wasn't doing 6 months ago." (*Id.*) In March, Decker again visited Dr. Fry.
28 Decker reported that she was still experiencing dizziness and intermittent headaches;

however, her energy "somewhat improved, she was performing more activities, and there was no more back pain. (*Id.*)

In April 2005, Dr. Fry filled out a form entitled "Medical Assessment of Ability to do Work-Related Physical Activities." (Tr. 416) Dr. Fry opined that Decker could walk and stand less than one hour in an 8 hour workday and she could sit more than one hour but less than two hours. (*Id.*) Dr. Fry also noted that Decker could lift and carry less than ten pounds.

In September 2005, Decker again visited Dr. Fry and stated that her headaches improved and her energy levels were slightly improved, but her activities were very limited and she was still struggling with insomnia. (Tr. 368) Dr. Fry noted that Decker has CFS with some improvement though still very fatigued, and insomnia. (*Id.*)

In October 2005, Decker visited Dr. Silverman's office, and reported migratory pain across her chest and right shoulder that was exacerbated by recent personal training sessions. (Tr. 435) Upon examination, Decker had two total tender points, zero painful/swollen joints, and no sign of enlarged lymph nodes. (Tr. 435, 437)

In November 2005, Decker is seen by Dr. Fry and reported that she was feeling better overall but was still struggling with insomnia. (Tr. 447) In March 2006, Decker visited Dr. Fry for a follow up visit and Dr. Fry noted that Decker was still suffering from CFS without any great improvement. (Tr. 447)

In March 2006, Dr. Fry again fills out a form entitled "Medical Assessment of Ability to do Work-Related Physical Activities." (Tr. 444) Dr. Fry made the same notations as in the April form.

In April 2006, Decker again visited Dr. Fry and stated that she was doing "a bit better," but had some "off days" over the past month. (Tr. 446) Decker also reported continuing struggles with insomnia. On a follow up visit with Dr. Fry in May, Decker reported that she was "slightly more energetic." (Tr. 446)

Decker visited Dr. Fry both in June and August 2006. She stated that she was still suffering from exhaustion but overall she was doing better. (Tr. 462)

In August 2006, Decker filled out another form entitled "Medical Assessment of Ability to do Work-Related Physical Activities." (Tr. 459) Dr. Fry noted that Decker is unable to perform work related activities on a regular basis due to headaches, irritable bowel syndrome, fatigue, nausea, and pain. Dr. Fry opined that Decker's degree of restriction was moderately severe. (*Id.*)

In August 2006, Decker was referred to Ravi Bhalla, M.D. Dr. Bhalla conducted a physical examination on Decker and noted a tenderness on palpation to the lumbar/lumbosacral spine, as well as positive trigger points at the gluteal muscles and the greater trochanter. (Tr. 467) Dr. Bhalla's assessment included hypothyroidism, lumbar disc degeneration, and CFS. (Tr. 468)

**II.     Standard of Review**

The Court will not set aside the Commissioner's decision unless: (1) the findings of fact are not supported by substantial evidence in the record, or (2) the decision is based on a legal error. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). In determining whether substantial evidence supports the Commissioner's decision, the Court must consider the record as a whole and review evidence both supporting and detracting from the decision. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). The ALJ's role is to make credibility determinations and to resolve conflicts in medical testimony. *Andrews*, 53 F.3d at 1039. If the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, then the Court will uphold the decision. *Id.* at 1040. However, if the ALJ applied improper legal standards, the Court must set aside a decision even if it is supported by substantial evidence. *See Ceguerra v. Sec'y of Health & Human Servs.*, 993 F.2d 735, 739 (9th Cir. 1991).

**III. Analysis**

To qualify for disability benefits under the Act, a claimant must show, among other things, that she is "under a disability." 42 U.S.C. § 423(a)(1)(E). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person is under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

### A. The Sequential Process

The Social Security regulations set forth a five-step sequential process for evaluating disability claims. 20 C.F.R. § 404.1520. *See also Reddick v. Chater,* 157 F.3d 715, 721 (9th Cir. 1998). A finding of "not disabled" at any step in the sequential process will end the inquiry. 20 C.F.R. § 404.1520 (a)(4). The claimant bears the burden of proof at the first four steps, but the burden shifts to the Commissioner at the final step. *Reddick,* 157 F.3d at 721. The five steps are as follows:

First, the ALJ determines whether the claimant is "doing substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled.

Second, if the claimant is not gainfully employed, the ALJ next determines whether the claimant has a "severe medically determinable physical or mental impairment." *Id.* § 404.1520(a)(4)(ii). To be considered severe, the impairment must "significantly limit [the claimant's] physical or mental ability to do basic work activities." *Id.* § 404.1520(c). Further, the impairment must either be expected "to result in death" or "to last for a continuous period of twelve months." *Id.* § 404.1509 (incorporated by reference in *id.* § 404.1520(a)(4)(ii)). If the claimant does not have a severe impairment, the claimant is not disabled.

Having found a severe impairment, the ALJ next determines whether the impairment "meets or equals" one of the impairments listed in the regulations. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is found disabled without further inquiry. If not, before proceeding to the fourth step, the ALJ will make a finding regarding the claimant's "residual functional capacity based on all the relevant medical and other evidence in [the] record." *Id.* § 404.1520(e). A claimant's "residual functional capacity" is the most she can do despite all her impairments, including those that are not severe, and any related symptoms. *Id.* § 404.1545(a)(1).

Fourth, the ALJ determines, despite the impairments, whether the claimant can still perform "past relevant work." *Id.* § 404.1520(a)(4)(iv). To make this determination, the ALJ compares its "residual functional capacity assessment . . . with the physical and mental demands of [the claimant's] past relevant work." *Id.* § 404.1520(f). If the claimant can still perform the kind of work she previously engaged in, the claimant is not disabled. Otherwise, the ALJ proceeds to the final step.

At the final step, the ALJ determines whether the claimant "can make an adjustment to other work" that exists in the national economy. *Id.* § 404.1520(a)(4)(v). In making this determination, the ALJ considers the claimant's "residual functional capacity" and her "age, education, and work experience." *Id.* § 404.1520(g)(1). If the claimant can perform other work, she is not disabled. If the claimant cannot perform other work, she will be found disabled. The Commissioner has the burden of proving the claimant can perform other work. *Reddick,* 157 F.3d at 721. "The Commissioner can meet this burden through the testimony of a vocational expert or by reference to the Medical Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2." *Thomas v. Barnhart*, 278 F.3d 947, 955 (2002) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999)). "If the Commissioner meets his burden, the claimant has failed to establish disability." *Thomas*, 278 F.3d at 955.

**B.     The ALJ's Findings**

In this case, the ALJ found that Decker met the insured status requirements of the Act through September 30, 2007, and that Decker was not engaged in any substantial gainful

activity since June 2, 2002. (Tr. 17) The ALJ also found at step two that Decker had the following severe impairments: osteopenia, chronic pain syndrome, and depression. (*Id.*) However, the ALJ determined that these impairments did not meet or medically equal one of the impairments listed in the regulations. (Tr. 18) The ALJ then assessed Thomson's residual functional capacity as the ability "to perform medium exertional work since she can lift 50 pounds occasionally and lift and carry up to 25 pounds frequently, and she can sit, stand, and walk at least 6 hours in an 8 hour workday, but must alternate sitting and standing during normal breaks and lunch periods." (*Id.*) Finally, the ALJ found that Decker is capable of performing her past relevant work as a freelance writer and/or a public relations representative. (Tr. 20)

### C. Alleged Step Two Error

Decker first argues that the ALJ erred at step two of the sequential process by failing to acknowledge both the existence and severity of CFS. In 1999, the Social Security Administration ("Administration") published Social Security Ruling ("SSR") 99-2p, 1999 WL 271569, in an effort to provide guidance as to when CFS should be considered a medically determinable impairment. As the Administration makes clear in this ruling, a finding of CFS as a medically determinable impairment cannot alone be premised upon a claimant's reported symptoms, rather "there must also be medical signs or laboratory findings before the existence of a medically determinable impairment may be established." 1999 WL 271569, *2. To this end, the Administration gave the following examples of medical signs that establish the existence of a medically determinable impairment:

> For purposes of Social Security disability evaluation, one or more of the following medical signs clinically documented over a period of at least 6 consecutive months establishes the existence of a medically determinable impairment for individuals with CFS:
>
> Palpably swollen or tender lymph nodes on physical examination;
>
> Nonexudative pharyngitis;
>
> Persistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points; or,

> Any other medical signs that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record.

1999 WL 271569, *3. After reviewing the record, and given the guidance provided by SSR 99-2p, the Court finds that there is substantial evidence in the record to support the ALJ's finding that Decker did not suffer from CFS in such a manner that it became a medically determinable impairment within the meaning of the Act.

Based upon the record before the Court, Decker did not suffer from palpably swollen or tender lymph nodes, nor nonexudative pharyngitis, for a period of at least six consecutive months. Further, although there are times in the medical record where Decker reports muscle tenderness and there is the presence of positive tender points, there is substantial evidence supporting a conclusion that such tenderness and positive tender points were inconsistent and not present and documented for six consecutive months.

Decker also cites the Epstein-Barr virus ("EBV") lab work that revealed a reading greater than 170 as an example of a medical finding helping to establish the existence of CFS as a medically determinable impairment. (Doc. # 21 at p. 16; Tr. 294) SSR 99-2p does give examples of laboratory findings that establish the existence of a medically determinable impairment in individuals with CFS, and one of the laboratory findings is "[a]n elevated antibody titer to Epstein-Barr virus (EBV) capsid antigen equal to or greater than 1:5120, or early antigen equal to or greater than 1:640." 1999 WL 271569, *3. It is not entirely clear to the Court how a reading of greater than 170 relates to the figures contained in SSR 99-2p, nevertheless, the Center for Disease Control ("CDC") has expressly stated that EBV tests should not be used to help diagnose CFS.[1] Given the current stance of the CDC, and the Administration's statements concerning the evolving understanding of CFS, the Court finds that the ALJ did not err by rejecting the EBV test as a basis for establishing CFS as a medically determinable impairment. *See* 1999 WL 271569, *2 ("With continuing scientific

---

[1] See http://www.cdc.gov/cfs/cfsdiagnosisHCP.htm (last visited 1/28/2010) ("No diagnostic tests for infectious agents, such as Epstein-Barr virus . . . are diagnostic for CFS and as such should not be used.").

research, new medical evidence may emerge that will further clarify the nature of CFS and provide greater specificity regarding the clinical and laboratory diagnostic techniques that should be used to document this disorder.").[2]

The Administration also notes in SSR 99-2p that the following mental findings establish the existence of a medically determinable impairment:

> Some individuals with CFS report ongoing problems with short-term memory, information processing, visual-spatial difficulties, comprehension, concentration, speech, word-finding, calculation, and other symptoms suggesting persistent neurocognitive impairment. When ongoing deficits in these areas have been documented by mental status examination or psychological testing, such findings constitute medical signs or (in the case of psychological testing) laboratory findings that establish the presence of a medically determinable impairment.

1999 WL 271569, *3. In this case, the only evidence in the record that Decker points to in support of her argument of a mental finding of CFS is Dr. Narvaiz's report. (Tr. 195-97) Dr. Narvaiz notes that Decker is "oriented to person, place, time and situation," and that Decker could recall four out of four objects immediately, and two out of four at five minutes. (Tr. 197) Although Decker struggled with a letter analogy, she understood other similarities given by Dr. Narvaiz. Decker repeated the number 8319454 correctly and she understood two different proverbs given by Dr. Narvaiz. (*Id.*) Dr. Narvaiz also stated that "[a]t this time, I feel that she does have the ability to return to work." (*Id.*) Such findings fall far short of mental findings related to "ongoing problems with short-term memory, information processing, visual-spatial difficulties, comprehension, concentration, speech, word-finding, calculation, and other symptoms suggesting persistent neurocognitive impairment." 1999 WL 271569, *3.

Decker also points to her bouts with depression and anxiety as establishing the existence of CFS as a medically determinable impairment. The Administration, in SSR 99-2p, states that "[i]ndividuals with CFS may also exhibit medical signs, such as anxiety or

---

[2] Moreover, Decker, in her reply brief, does not argue that the EPV test should be considered in the wake of the CDC's current understanding of CFS, nor does Decker object to the Commissioner's reliance and citation to the CDC's current understanding.

depression, indicative of the existence of a mental disorder. When such medical signs are present and appropriately documented, the existence of a medically determinable impairment is established." Although the record supports a finding of depression and an anxiety related disorder, there is no suggestion in the record that Decker's depression or anxiety is in any way related to her difficulties with CFS. Indeed, Decker states at various times in the record that she was first diagnosed with depression in 1968, long pre-dating the alleged onset of her CFS. The Court finds that the ALJ did not err in rejecting Decker's depression and anxiety as a basis for finding the existence of CFS as a medically determinable impairment.

Therefore, the Court finds that the ALJ did not err at step two in the sequential process by finding that Decker's severe impairments included osteopenia, chronic pain syndrome, and depression, but not CFS.

### D. Alleged Step Four Error

Decker argues that the ALJ erred at step four of the sequential process by failing to properly: 1) assess the credibility of Decker's subjective complaint testimony; 2) consider medical source opinion evidence; and 3) consider third party reports.

#### 1. Subjective Complaint Testimony

The ALJ found Decker's complaints regarding the intensity, persistence, and limiting effects of impairments "not entirely credible." (Tr. 19). If a claimant produces objective medical evidence of an underlying impairment, then the ALJ cannot reject the claimant's subjective complaints solely upon a lack of objective medical support for the alleged severity of the pain. *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001). If the ALJ finds the claimant's subjective pain testimony not credible, the ALJ must make findings sufficiently specific to allow the reviewing court to conclude that the ALJ rejected the testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony. *Id*. at 856-57. If no affirmative evidence of malingering exists, then the ALJ must provide clear and convincing reasons for rejecting the claimant's testimony about the severity of her symptoms. *Id*. at 857.

Because no affirmative evidence of malingering exists, the ALJ had to provide clear and convincing reasons for disbelieving Decker's reports of the severity of her pain. The ALJ offered the following reasons for not fully crediting Decker's subjective complaints:

> The claimant alleged that she was unable to work because of her impairments and limitations, but the medical evidence considered as a whole and the claimant's that she works as a freelance writer and editor for a Buddhist magazine contradict her allegation that she is unable to perform her past work as a freelance writer. In order to perform such work, the claimant must be capable of sitting for significant periods of time. Additionally, the claimant reported that she remains active, performs Tai-Chi, is able to drive herself, goes to her doctor's office three days a week, and stated that she was working as an editor in April 2004. In October 2006, Elizabeth Bidula prepared a lay opinion statement which reported that the claimant was not paid to perform her writing and editorial services for the Buddhist organization newsletter and that the claimant stopped editing in 2004 because it was too exhausting for her. The undersigned notes that the claimant alleged she has been unable to work since June 2, 2002, all of which statements significantly diminish her credibility.

(Tr. 19)

The ALJ first proffered reason for his credibility determination considered the medical evidence as a whole as it relates to Decker's complaints concerning the limiting effects of the impairments. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins*, 261 F.3d at 857 (citing 20 C.F.R. §404.1529(c)(2)). The Court finds the ALJ legitimately considered the lack of corroborating objective medical evidence for Decker's claimed level of pain.

The Court finds the ALJ's second reason also supports his credibility determination. There are numerous references in the record pertaining to Decker's continuing work as an editor, and at times a writer, for certain newsletters and other publications. Decker's assertion that she is unable to perform her past work is contradicted by Decker's own statements to her treating physicians. The lay opinion statement concerning Decker's editing activities also contradicts Decker's assertion that she was unable to perform her past work since June 2002. The ALJ also noted that Decker reported at various times that she remained

- 14 -

active, performed Tai-Chi, was able to drive herself and go to doctor visits three days a week, in addition to working as an editor in April 2004.

The Court finds that the ALJ met his burden of providing clear and convincing reasons for rejecting Decker's subjective pain testimony. The ALJ's reasons were sufficiently specific to allow the Court to determine that the ALJ did not arbitrarily discredit Decker's testimony. *Rollins*, 261 F.3d at 856-57.

### 2. Treating Physician Opinions

Decker next argues that the ALJ erred by failing to properly consider the opinions of Decker's treating physicians and a consulting state agency physician. By rule, the Administration favors treating physician opinions over non-treating physicians. *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. §404.1527). In addition, the Administration favors examining physician opinions over opinions of non-examining physicians. *Id.*

If a treating physician's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case, then it is given "controlling weight." *Id.* If a treating physician's opinion is not sufficiently supported by medical evidence and other substantial evidence in the case, however, the ALJ need not give the opinion controlling weight. *Id.* Further, even when a treating doctor's opinion is given the most weight in a disability case, the opinion is not binding on the ALJ regarding the existence of an impairment or the ultimate determination of disability. *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).

If the treating physician's opinion is contradicted by another physician, the ALJ may reject the treating physician's opinion by giving specific and legitimate reasons for doing so, rather than having to give clear and convincing reasons. *Orn*, 495 F.3d at 632. An ALJ meets his burden of providing specific and legitimate reasons for rejecting a treating physician's opinion if the ALJ sets out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Id.*

The Court disagrees with Decker that her treating physicians' opinions are entitled to controlling weight. When filling out the Medical Assessment of Ability to do Work-Related Physical Activities form, Decker's physicians repeatedly base their findings and conclusions on Decker's reports of pain and fatigue. An ALJ can give little weight to a treating doctor's opinion when the opinion is based on a claimant's subjective complaints. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *Batson*, 359 F.3d at 1195. Moreover, the Court has already held that the ALJ properly discredited Decker's subjective pain testimony. The Court finds that the treating physicians' assessments of Decker's capabilities are not well-supported by clinical findings and other substantial evidence in the record.

Decker's reliance upon *Reddick v. Chater*, 157 F.3d 715 (9th Cir. 1998) is also misplaced. Decker relies upon *Reddick* for the assertion that it is improper in cases involving CFS for the ALJ to reject treating physician opinions simply because such opinions are premised solely upon the claimant's subjective complaints. The Court finds no support for this assertion in *Reddick*. In any event, in *Reddick*, the ALJ expressly found that "'the medical evidence establishes that Claimant has chronic fatigue syndrome' . . . ." 157 F.3d at 724. In this case, the ALJ found precisely the opposite. For these reasons, the Court finds *Reddick* to be inapposite.

Further, much of Decker's argument that the ALJ erred at step four of the sequential process is premised upon Decker's CFS being a medically determinable impairment. However, as discussed earlier, the ALJ committed no error by not including CFS as a severe impairment at stage two in the sequential process. For this reason the ALJ was not required to take CFS into account at stage four in the sequential process.

The Court also finds that the opinions of the treating physicians were not uncontradicted. Because their opinions were contradicted by record evidence, the ALJ only had to give specific and legitimate for rejecting the opinions. *Orn*, 495 F.3d at 632. The Court finds that the ALJ satisfied this burden by setting out a thorough summary of the facts

and conflicting clinical evidence, stating his interpretation thereof, and making findings.[3] *Id.* The Court holds that the ALJ properly considered and weighed the medical evidence in this case. Moreover, when the evidence supports either confirming or reversing the ALJ's decision, the Court may not substitute its judgment for that of the ALJ. *Batson*, 359 F.3d at 1196.

For these reasons, the Court finds that the ALJ did not err in rejecting the opinions of Decker's treating physicians.

### 3. Third Party Statements

Finally, Decker argues that the ALJ erred by failing to address a report by Decker's sister, Muriel Mortensen, and failing to reject a report submitted by a friend of Decker, Elizabeth Bidula. The ALJ does discuss the report submitted by Bidula:

> In October 2006, Elizabeth Bidula prepared a lay opinion statement which reported that the claimant was not paid to perform her writing and editorial services for the Buddhist organization newsletter and that the claimant stopped editing in 2004 because it was too exhausting for her. The undersigned notes that the claimant alleged she has been unable to work since June 2, 2002, all of which statements significantly diminish her credibility.

(Tr. 19) Although the ALJ does not use any combination of magic words, it is clear from the above statement that the ALJ rejects any assertions by Bidula that Decker was disabled from the alleged onset date.

With respect to Mortensen, the Court agrees that the ALJ did not expressly address her third party report. "In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1053 (9th Cir. 2006). Consequently, "[i]f the ALJ wishes to discount

---

[3] In her opening brief, Decker argues that the ALJ erred by not discussing the opinion of treating physician Dr. Abromovitz. (Doc. # 21 at p. 20.) However, the ALJ expressly discusses Dr. Abromovitz's opinion by stating that "the undersigned notes that Alan Abromovitz, M.D., is an orthopedic specialist and his clinical records reflect treatment for lumbar paraspinal pain and a diagnosis of chronic pain syndrome, but the objective medical evidence does not support such a diagnosis." (Tr. 18) It is clear to the Court that the ALJ considered and rejected Dr. Abromovitz's opinion.

- 17 -

the testimony of lay witnesses, he must give reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).

"[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout*, 454 F.3d at 1056. Applying this standard, the Court finds that no reasonable ALJ would have reached a different disability conclusion even had Mortensen's statements been credited.[4]

As discussed above, and similar to Decker and Bidula's statements, Mortensen's statement was contradicted by the objective medical evidence as to Decker's functional capacity. This is especially true when the statements contained in Mortensen's report are examined. Mortensen states that Decker was able to participate in a wide range of activities after the alleged onset date of her disability, including feeding and caring for her four cats, preparing meals, shopping, attending social activities, doing laundry which requires traversing three flights of stairs, doing light household chores, working on a monthly newsletter, attending religious meetings weekly and a photography club monthly. (Tr. 119-27) Further, in a section of the report entitled "Information About Abilities," Mortensen was invited to "[c]ircle any of the following items the disabled person's illness, injuries, or conditions affect." (Tr. 124) Mortensen circled two terms, completing tasks and concentration, but left un-circled such terms as lifting, squatting, bending, standing, walking, sitting, kneeling, memory, and understanding. For these reasons, no reasonable ALJ would have reached a different disability conclusion even had Mortensen's statements been credited.

---

[4] The Court notes that lay witness testimony is considered when the ALJ is making its residual functional capacity assessment. In this case, the ALJ determined at step two that Decker did not suffer from CFS in such a manner that it could be considered a severe impairment. Thus, for harmless error analysis, CFS is not considered during the residual functional capacity assessment.

- 18 -

**IV. Conclusion**

For the reasons discussed above: the ALJ properly discredited Decker's testimony regarding the intensity, persistence, and limiting effects of her medically determinable impairments; the ALJ also properly resolved the conflicts in the medical evidence; and the failure to discuss Mortensen's report constituted harmless error. As such, the Court will affirm the decision of the ALJ.

Accordingly,

**IT IS ORDERED** that the decision of the Appeals Council and the Commissioner of Social Security be affirmed.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly. The judgment will serve as the mandate of this Court.

DATED this 2nd day of February, 2010.

James A. Teilborg
United States District Judge